The Triplett Lumber Company was a North Carolina corporation with its office and place of business in Charlotte, and engaged in the wholesale lumber business. In the due course of its business it purchased lumber from various mill owners and had the same shipped directly to its customers. The company paid mill owners for the lumber, and upon shipment charged the customers with the purchase price. Apparently the lumber company was doing a large and profitable business, and hence it was compelled to have a large amount of money available to carry on its extensive operations. On 2 September, 1926, the lumber company made an agreement with the defendant Commercial Credit Company. This agreement is usually referred to as a "covering agreement" and provided in substance that the lumber company would sell and the Credit Company purchase all such open accounts, notes, drafts, acceptances, leases, mortgages and choses in action belonging to the Lumber Company or accepted by it in due course of trade. The Credit Company agreed to purchase such evidences of indebtedness "as may be acceptable" and to pay therefor one hundred per cent of the face value thereof less certain charges. The purchase price of such accounts was to be paid as follows: (a) 77 per cent of net face value upon acceptance by the Credit Company; (b) the remaining 23 per cent to be paid in cash to the Lumber Company when such evidences of indebtedness were actually paid by the customers or purchasers of the lumber from the Lumber Company. The agreement further provided that the defendant should perform certain services which are not deemed material to this controversy. The compensation provided for the Credit Company by the terms of the agreement was 1/30 of 1 per cent of the net face value of accounts for each day, etc. It was also provided that *Page 513 
the Lumber Company should send all original checks, drafts, notes and other evidences of payments received by it from its customers to the office of the defendant in Baltimore, Md. The following clauses appear in the agreement: (1) All acts, agreements, certificates, assignments, transfers and transactions hereunder, and all rights of the parties hereto shall be governed as to validity, enforcement, interpretation, construction, effect, and in all other respects by the laws and decisions of the State of Delaware. (2) This agreement shall not become effective until accepted by its duly authorized officers of second party (defendant Credit Company) at Baltimore, Md.
The record shows that the agreement "was accepted in Baltimore, Md., by Commercial Credit Company, this 3 September, 1926."
There were various other documents introduced in evidence disclosing the method of business transacted by the parties. When the Lumber Company sent notes, acceptances, etc., to the Credit Company the Credit Company would issue a check in accordance with the terms of the agreement drawn upon its bank account in Baltimore, Md., and these checks would be forwarded by mail to the Lumber Company at Charlotte and used in the due course of business.
In the course of time the Lumber Company became insolvent, and thereafter, on 12 March, 1929, the plaintiff Bundy was made permanent receiver of the Triplett Lumber Company. The receiver undertook to collect accounts due the Lumber Company and found that many of these accounts were claimed by the defendant Commercial Credit Company, and that said defendant had notified the debtors not to pay the receiver. Thereupon the receiver instituted this action against the defendant to assert in the receivership proceedings any right, title or interest it had to said claims. The defendant filed a claim with the receiver for the sum of $12,051.40. When the complaint seeking an injunction was filed and the receivership made permanent, the defendant filed an answer setting up the contract between it and the Lumber Company and asserting that it was the owner of and entitled to the proceeds of certain accounts. The plaintiff filed an amended complaint and alleged that said contract was usurious in that it resulted in an interest rate of approximately fifteen per cent. It was further alleged that the signing of the contract in Baltimore, Md., was a scheme and device to evade and set at naught the usury laws of North Carolina. Whereupon, the plaintiff demanded judgment against the defendant for $19,830.78. The defendant filed a reply to the amended complaint, alleging (a) that the transaction contemplated by the contract was a purchase and not a loan; (b) that the express terms of the agreement provided that it should be governed by the laws of Delaware which were specifically *Page 514 
pleaded; (c) that the law of Maryland, where the contract was actually executed, governed the dealings between the parties. The Maryland law was also specifically pleaded. A reply was filed to the amended answer and a replication to the reply and various other pleadings filed setting forth the various aspects of the cause of action of plaintiff and the various defenses interposed by the defendant.
The cause came on for trial upon the following issues:
1. "Is the plaintiff the owner of the accounts referred to in the complaint, as alleged in the complaint?"
2. "Did the defendant knowingly take, receive, reserve or charge the Triplett Lumber Company a greater rate of interest than six per cent per annum, as alleged in the amendment to the complaint?"
3. "Were the contract and dealings between the Triplett Lumber Company and the defendant governed and controlled by the laws of North Carolina?"
4. "What amount of penalty, if any, is the plaintiff entitled to recover of the defendant for usurious interest paid?"
5. "What amount is the plaintiff indebted to the defendant?"
The jury answered the first issue "Yes," the second issue "Yes," the third issue "Yes," the fourth issue "$11,000," and the fifth issue "$12,051.40."
Judgment was entered to the effect that the defendant was entitled to prove an unsecured claim in the sum of $1,051.41.
From judgment so rendered both parties appealed.
The paramount questions of law to which all others are subsidiary may be stated as follows:
1. Was the agreement a Maryland or a North Carolina contract?
2. What are the rights of the parties thereunder?
The evidence bearing upon the execution of the contract is rather uncertain and indefinite. It appears that the defendant maintained a branch office in Charlotte, North Carolina, and that Mr. Murphy was in charge thereof. Mr. Triplett, president of the insolvent Lumber Company, testified with reference to the negotiations leading up to the execution of the contract as follows: "We conducted negotiations looking towards the making of the contract with the Commercial Credit Company with Mr. Murphy. He came into our office quite often prior to the contract looking for business. We made a contract with Mr. *Page 515 
Murphy; of course, he did not sign the contract. We conducted negotiations for the contract with Mr. Murphy in Charlotte, North Carolina. . . . I was in my office in Charlotte, North Carolina, when I signed that contract on behalf of Triplett Lumber Company. . . . Those signatures were witnessed by Mr. Murphy in our office." The foregoing is substantially all of the evidence offered in behalf of plaintiff touching the actual execution of the agreement.
The defendant offered the following testimony of the assistant secretary: "I first saw this contract in Baltimore. It came through the mail to my desk. I signed it. F. M. Nicodemus, treasurer of the company at that time, also signed it on 3 September, 1926. It was signed in duplicate. After signing it the duplicate was forwarded by me to the Triplett Lumber Company; also copy of the contract for our files and the original copy was made a part of my permanent records in the Baltimore office. I spoke of forwarding; I mean mailed it."
"By the great weight of authority it is held that, in a case like the present one, every presumption is against an intention to violate the law, so that, where notes are executed in one State and payable in another, the parties will be presumed to have contracted with reference to the law of the place where the transaction would be valid rather than in view of the law by which it would be illegal, provided, however, that there is no evidence of bad faith or of an intention to evade the usury law of the latter State. Therefore, when a contract is usurious by the law of the State wherein it was made, but not according to that of the State wherein it is to be performed, the parties will be presumed to have contracted with reference to the law of the latter State, and the contract will be upheld, subject to the conditions of good faith just set forth." Zimmerman v.Brown, 166 P. 924. Moreover, it is a generally accepted principle that "the test of the place of a contract is as to the place at which the last act was done by either of the parties essential to a meeting of minds. Until this act was done there was no contract, and upon its being done at a given place, the contract became existent at the place where the act was done. Until then there was no contract." Wharton Conflict of Laws (3d ed.), sec. 422(a); C. I. T. Corporation v. Sanderson, 43 Fed., 2d 985.
Applying these principles of law to the facts, it is clear that the contract was executed in Baltimore, Maryland, because the last act essential to the completion of the agreement was performed at that place. Hence, this was the place of execution, and, nothing else appearing, it would follow that it was the intention of the parties that the validity and performance thereof should be governed by the laws of Maryland. But something else does appear. It is alleged that the *Page 516 
contract was executed in Baltimore, Maryland, for the purpose of evading the usury laws of this State, and that selecting Baltimore, Maryland, as the place of execution and completion of the contract was in bad faith and constituted a scheme or device purposely designed to enable the defendant to charge, receive and collect interest in excess of six per cent. Therefore, an issue of fact was sharply drawn. Such issue of fact has not been submitted to a jury. The issue actually submitted being the third issue, embraced a conclusion of law only and a new trial must be awarded.
In arriving at a correct conclusion with respect to the second proposition of law, it is necessary to determine whether the contract in controversy contemplates a purchase of accounts and evidences of indebtedness or a loan of money. Deeming a discussion of the evidence inadvisable, as a new trial must be awarded, suffice it to say that the Court is of the opinion that the agreement contemplates a loan, and that the parties themselves placed such a construction upon the instrument in the correspondence appearing in the record. Cole v. Fibre Co., ante, 484, where the authorities are assembled. The identical contract was construed by the Circuit Court of Appeals in Brierly v. Commercial Credit Co., 43 F.2d, 724-730. The Court held that the instrument contemplated a loan and not a purchase. A contrary conclusion was reached In re Eby, 39 F. 2d, p. 76, by the District Court for the Eastern District of North Carolina in construing a contract made by the defendant similar to the one involved in this controversy. Seeman v. Philadelphia Warehouse Co.,274 U.S. 403, 71 Law Ed., 1123. The covering agreement provided that the agreement should be governed "as to the validity, enforcement, interpretation, construction, effect, and in all other respects by the laws and the decisions of the State of Delaware." However, the record does not disclose that any transaction took place in Delaware or that the parties even contemplated either the making or the performance of the contract in said State. Therefore, the stipulation is deemed immaterial. Brierly v.Commercial Credit Co., supra.
Thus, we have a contract for the loan of money to a citizen of this State, executed in the State of Maryland, and such contract is under attack upon the ground that it was made in bad faith and with intent to evade the usury laws of North Carolina. Hence, the final question is what are the rights of the parties under such contract? The general principle recognized in all jurisdictions is that ordinarily the execution, interpretation and validity of a contract is to be determined by the law of the State or county in which it is made. This principle was first considered by this Court in 1821 in the case of McQueen v. Burns, 8 N.C. 476. Thereafter various aspects of the question have been *Page 517 
discussed in the following cases: Arrington v. Gee, 27 N.C. 590; Davis v.Coleman, 33 N.C. 303; Houston v. Potts, 64 N.C. 33; Commissioners v. R.R., 77 N.C. 289; Williams v. Carr, 80 N.C. 295; Armstrong v. Best,112 N.C. 59; Meroney v. Loan Association, 112 N.C. 842; Meroney v. LoanAssociation, 116 N.C. 882; Faison v. Grandy, 128 N.C. 438; Smith v.Ingram, 130 N.C. 100; Cannaday v. R. R., 143 N.C. 439; Rankin v.Mitchem, 141 N.C. 277; Burrus v. Witcover, 158 N.C. 384; Fashion Co. v.Grant, 165 N.C. 453; Ripple v. Mortgage Corp., 193 N.C. 422. InCannaday v. R. R., 143 N.C. 439, the Court quoted with approval the following statement of law: "It is generally agreed that the law of the place where the contract is made is prima facie that which the parties intended, or ought to be presumed to have adopted, as the footing upon which they dealt, and that such law ought, therefore, to prevail in the absence of circumstances indicating a different intention." The Maryland statute with reference to usury has been construed by the Court of last resort in that State to mean that "lenders and corporate borrowers are free to agree upon any rate of interest above the regular limit of the statutory law." Carozza v. Federal Finance Co., 131 A. 332; Penrose v. CarltonNational Bank, 127 A. 856.
Notwithstanding the general rule, there are certain exceptions thereto which have been adopted in this jurisdiction and intimately wrought into the fabric of our law. These exceptions are classified as follows, inBurrus v. Witcover, 158 N.C. 384: "The general doctrine that a contract, valid where it is made, is valid also in the courts of any other country or State, where it is sought to be enforced, even though had it been in the latter country or State it would be illegal and hence unenforceable, is subject to several exceptions: (1) When the contract in question is contrary to good morals; (2) when the State of the forum, or its citizens, would be injured by the enforcement by its courts of contracts of the kind in question; (3) when the contract violates the positive legislation of the State of the forum, that is, contrary to its Constitution or statutes, and (4) when the contract violates the public policy of the State of the forum. These exceptions are grounded on the principle that the rule of comity is not a right of any State or country, but is permitted and accepted by all civilized communities from mutual interest and convenience, and from a sense of the inconvenience which would otherwise result, and from moral necessity to do justice in order that justice may be done in return." But there are certain other exceptions which should be added to those set out in the Burrus case. They are: (a) when the contract is made in a foreign State or country with the intent and purpose to evade the usury laws of this State; (b) when a loan is made in a foreign State or country and is secured by a *Page 518 
lien upon real estate in this jurisdiction, the interest laws of North Carolina are applicable. Meroney v. Building and Loan Association,112 N.C. 842; Meroney v. Building and Loan Association, 116 N.C. 882;Faison v. Grandy, 128 N.C. 438; Smith v. Ingram, 130 N.C. 100. The mere fact that a loan was made to a citizen of this State by a citizen of a foreign State and a rate of interest in excess of six per cent was reserved or charged, does not necessarily offend the public policy of this State. TheRipple case, supra, holds that an agreement by the parties for the payment of interest in excess of the legal rate is in violation of our statute and contrary to the public policy of this State, and furthermore, that such agreement standing alone is void. But this declaration of law applies to specific and independent contracts for excess of interest and upon correct construction is not an authority for the position that a contract made in a foreign State at a higher rate of interest than allowed by law in this State is necessarily contrary to public policy.
The plaintiff contends that the assignment of accounts was in the nature of a chattel mortgage upon property in this State, and that hence North Carolina was the situs of the security. Even if it be conceded that the principle governing real estate security applies to personal security, it appears from the evidence that the accounts and evidences of indebtedness were sent to Baltimore, Md., thus establishing a situs in Maryland rather than in North Carolina.
Summarizing the various aspects of the case, if, upon a further trial, the jury shall find that the contract was a Maryland contract and executed in good faith with no intention of evading the usury laws of North Carolina, then the law of Maryland applies in full force to the transactions. If, upon the other hand, the jury shall find that the contract was executed in Maryland in bad faith with the purpose and intent of evading the usury laws of North Carolina, then the North Carolina law applies in full force.
The plaintiff appealed, assigning as error the following instruction given by the trial judge to the jury: "The burden is on the plaintiff to satisfy you by the greater weight of evidence, gentlemen of the jury, of such amount, if any you may find, it is entitled to recover. You may find it is entitled to recover nothing; you may find it is entitled to recover any amount up to $19,830.78; that it has satisfied you by the greater weight of evidence it is entitled to recover from the defendant." The record shows the following stipulation: "It is further stipulated that the amounts set forth in the right-hand column of said statement, aggregating $9,915.39, were paid by the Lumber Company to the Credit Company as shown by the facts hereinafter referred to." The plaintiff contends that this stipulation is equivalent to an admission that the *Page 519 
defendant received $9,915.39 as usury, and that the penalty prescribed by statute C. S., 2306, permits recovery for twice said amount, aggregating $19,830.78. The stipulation is not specific enough to warrant the inference that said sum was paid by the Lumber Company and received by the Credit Company as excess interest. Notwithstanding, the plaintiff was entitled to recover under the statute "twice the amount of interest paid," and the exception of plaintiff to the instruction complained of is sustained.Ripple v. Mortgage Co., 193 N.C. 422; Sloan v. Insurance Co., 189 N.C. 690.
There are other exceptions in the record which are neither discussed nor decided for the reason that a new trial upon all proper issues arising must be awarded, and the case should be tried upon its merits.
Plaintiff's appeal: New trial.
Defendant's appeal: New trial.